[Cite as *State v. Boyd*, 2013-Ohio-1067.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee                 :          C.A. CASE NO.    25182

v.                                     :          T.C. NO.    11CR2608

ALLEN BOYD                             :          (Criminal appeal from
                                                  Common Pleas Court)

    Defendant-Appellant                :

                                       :

. . . . . . . . . .

# O P I N I O N

Rendered on the ___22nd___ day of ___March___, 2013.

. . . . . . . . . .

JOSEPH R. HABBYSHAW, Atty. Reg. No. 0089530, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ROBERT L. MUES, Atty. Reg. No. 0017449, 1105 Wilmington Avenue, Dayton, Ohio 45420
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**  This matter is before the Court on the Notice of Appeal of Allen

Boyd, filed

May 4, 2012. Boyd appeals from his April 27, 2012 conviction and 30 month sentence on one count of having weapons while under disability (prior drug conviction), in violation of R.C. 2923.13(A)(3), a felony of the third degree.

{¶ 2} Boyd was indicted on August 25, 2011, and he entered a plea of not guilty. Boyd subsequently entered a plea of no contest, which he was later permitted to withdraw after learning that the probation department recommended that he be sentenced to a term of imprisonment. On November 8, 2011, Boyd filed a motion to suppress, wherein Boyd sought suppression of the following: "1. Any and all evidence obtained from Defendant as a result of the seizure of Defendant; 2. Any and all evidence obtained as a result of information obtained from the seizure of Defendant." A hearing on the motion was held on December 20, 2011. Thereafter, the trial court overruled the motion.

{¶ 3} At the suppression hearing, Robert Brazel testified that he is a police officer for the city of Vandalia with seven years of experience. Brazel stated that on August 1, 2011, while on routine patrol, he was dispatched to 56 East Alkaline Springs Road on the report of domestic violence, specifically on a report that the female resident there had called police and stated that Boyd, her boyfriend, had put a gun to her head. According to Brazel, "[d]ispatch advised that a female had called in stating that the person she lived with had put a gun to her." Brazel stated that he has responded to 56 East Alkaline Springs "numerous" times regarding Boyd. Brazel stated that he arrived at the address, which is a two-story, four-unit apartment building, in less than five minutes, and that upon arrival he did not observe anyone outside. According to Brazel, the "nature of the complex is that it's for single mothers and their children only." Brazel stated that men are allowed to visit the

complex but not live there. Brazel stated that he understood Satterwhite, "from dealing with her in previous encounters, * * * to be the leaseholder" of her apartment in the building. When asked if he had "any reason to believe, any knowledge, that [Boyd] was a lawful resident at that apartment," Brazel responded, "through my dealings there, I understood that [Boyd] basically lived there. But as far as being a leaseholder, I have no knowledge of whether he was or wasn't."

{¶ 4} Brazel stated that another officer arrived on the scene right before him, another arrived after Brazel, and that Brazel also requested and received further assistance from Butler Township. Brazel stated that he stationed officers at the front right and back left corners of the building, and then directed Dispatch to call Satterwhite and instruct her to exit the building. Brazel stated that Satterwhite approached him upon exiting the building and advised him that she had gone upstairs in the apartment and found Boyd crushing pills on her new bedspread. When she told him to stop, "he picked up a gun he had on the bed and pointed it at her head," according to Brazel's testimony. Brazel testified that Satterwhite described the weapon as a handgun. He stated that Satterwhite advised him that she wanted Boyd "out" of the apartment.

{¶ 5} Brazel stated that Satterwhite also told him that a "third person," her nephew, was inside the apartment, and that he had not been involved in the altercation. Brazel stated that Satterwhite provided the phone numbers of Boyd and her nephew. After making contact with the nephew by phone, Brazel stated that the nephew also exited the building and "provided us some more information about Mr. Boyd and his actions inside, where he was in the building." Brazel testified that the nephew stated that he had been

downstairs and did not see a handgun. The nephew also stated that Boyd was "acting crazy," and that he was standing in front of the refrigerator with both of the doors to the appliance open.

{¶ 6} Brazel stated that numerous unsuccessful attempts were made to reach Boyd by phone, and he stated that the officers also knocked on the front and back doors of the apartment with no response. After over half an hour, Brazel stated that he contacted his lieutenant, anticipating that a SWAT team would be required to remove Boyd from the apartment. Brazel stated that a SWAT team ultimately was not contacted, and that Boyd eventually exited the apartment. Brazel testified that Officers Martin and Shafer ordered him to the ground and placed him in handcuffs.

{¶ 7} The following exchange occurred:

Q. What did you do after the defendant was taken into custody?

A. At that point, myself and Sergeant Stanley cleared the building to make sure there was no other suspects or victims in the - - in the apartment.

Q. Describe for the court how it is that you went about clearing the property.

A. Myself and Sergeant Stanley announced that we were police officers, we - - as we entered the building. We did a protective sweep of the first floor. I believe Sergeant Stanley held point on the stairs as I cleared the living room and then the kitchen.

And then we went up the stairs to clear the, I believe there's two bedrooms, a bathroom and a couple closets upstairs. I went up and cleared

the bathroom and the back bedroom as Sergeant Stanley provided point coverage on the front bedroom, which turned out to be the master bedroom.

As I was clearing the first two rooms, Sergeant Stanley announced that he had a gun in the other apart-  - - or, I'm sorry, in the other bedroom.

After I finished clearing the first two, we stepped in and cleared the master bedroom.   And that's when we found the firearm sittin' on the bed.

Q.  Was the firearm concealed in any way when you went into the bedroom?

A.  No, it was not.

Q.  Was it in plain sight?

A.  Yes.

Q.  What did you do when you saw that firearm?

A.  Once we saw the firearm, we finished our protective sweep of the room, left it as it was, and backed out of the apartment knowing that we had no other suspects, no other victims in the building.

We went back downstairs to post an officer downstairs while we went to get a camera and photograph the scene.

Brazel testified that he collected the firearm and sent it to the Miami Valley Regional Crime Lab "to be function tested."

{¶ 8}    On cross-examination, Brazel testified that he was dispatched to Satterwhite's residence at approximately 4:00 p.m. He stated that neither Satterwhite nor her nephew appeared to be injured when they exited the apartment.   He described the situation

as "extremely dangerous" due to the lay out of the apartment building. Brazel stated that he and another officer approached the front door of the apartment initially and knocked, but then Brazel "decided to pull us back to prevent our injury." Brazel stated that he then knocked on the rear door of the apartment while another officer provided cover. Brazel stated that Boyd eventually appeared on his own accord and no tear gas was used. Brazel stated that he was unaware of any threats made by Boyd to any neighbors. Brazel stated that Boyd was arrested "for domestic threats" based upon what Satterwhite told the officers. On redirect examination, Brazel stated that "the master bedroom is above the front door. There was really no way for us, there was no hard cover and we didn't have a shield or anything like that that we could use to provide ourselves cover to make it to the front door safely" to knock. When asked why he performed a protective sweep of the apartment, Brazel responded, "I have to check and make sure there's not another victim, not another suspect inside the building. To make sure there's nobody injured or anything like that in the house."

{¶ 9} Sergeant Todd Stanley of the Butler Township Police Department testified that he has 14 years of experience, and that on August 1, 2011, he was notified by the Vandalia Police Department about the incident at issue and he responded to Satterwhite's address. Stanley stated that upon arrival, he proceeded to the right front corner of the building to establish a perimeter as instructed by Brazel. Stanley stated that he observed Boyd exit the building, and that he "ordered him to get down on the ground. After several yelling orders, he finally got to his knees. I then helped him get to the ground and other officers came over while I made cover and they handcuffed him." Stanley stated that he

pushed Boyd to the ground with his foot after Boyd "gets down to his knees and he just sits there. He won't go down." Stanley stated that after Boyd was removed from the scene, "Officer Brazel and I then did a sweep of the house to make sure there was no one else inside or any - - or anyone injured inside."

{¶ 10}  The following exchange occurred:

Q.  Did you do that immediately after the defendant was secured?

A.  It was within moments, yeah.

Q.  What happened when you went inside the apartment?

A.  We - - we checked the lower level. We then went upstairs. Officer Brazel was in front of me and I was taking a position of cover behind Officer Brazel. He went up to the top of the steps and began looking in the - - the rooms upstairs.

I stood in the center of the hallway keeping cover on his back while he was checking a room that would have been to the south side of the - - of the building. And then I glanced into the building - - the room that was to the - - to my right, which would have been the north side, and I saw on the bed a firearm.

{¶ 11}  On cross-examination, Stanley stated that as he repeatedly ordered Boyd to the ground, Boyd "was confused. Looked at me like, you know, it was a dream or something." When asked if there were "any other civilians from the apartments around at all," Stanley stated the officers "had evacuated that building." Stanley then stated that he "didn't do a knock on any doors or anything, but when I got there, they were - - people were

coming out. So, no, I didn't assist 'em, but I seen people coming out." Stanley stated that he observed near the gun on the bed "baby powder or something. It was a white powdery substance."

{¶ 12} Phillip Shafer testified that he is a police officer with the City of Vandalia with two years experience. He stated that he was dispatched to Satterwhite's residence on the date of the incident, and that he has been there previously on "[d]omestics, disorderlies," which are "usually" between Satterwhite and Boyd. On August 1, 2011, Shafer stated that the officers were dispatched to the East Alkaline address "for a domestic violence," and "[d]ispatch had advised us that Ms. Satterwhite had called and stated that Mr. Boyd was not acting in his right mind and that he had pointed a pistol at her." Shafer stated that he helped to secure the perimeter of the building. Shafer stated that he initially did not have any contact with Satterwhite when she exited the building, but that she later told him that she wanted Boyd "out." Shafer stated that Satterwhite told her "that they had gotten into an argument about bills and various things. And that Mr. Boyd had been arguing back with her and then pointed a pistol at her." Shafer's testimony regarding Boyd's initial refusal to get on the ground as ordered was consistent with the other officers.

{¶ 13} On cross-examination, Shafer stated that while he has responded to Satterwhite's residence in the past, he has not trespassed Boyd from the property. Shafer stated that he, in addition to Stanley, yelled commands to Boyd when he exited the apartment. Shafer stated that Boyd "didn't appear to be understanding what we were trying to tell him to do." Shafer stated that Boyd's "speech was slurred and he seemed slightly lethargic." Shafer stated that he did not smell alcoholic beverages on Boyd.

{¶ 14} In overruling Boyd's motion to suppress, the trial court initially noted as follows:

The Defendant's motion to suppress was divided into two branches. The first branch seeks to suppress any and all evidence obtained from the Defendant as a result of his being seized. The second branch seeks to suppress any and all evidence obtained as a result of information obtained from the seizure of the Defendant. As a matter of law, the Court finds that no evidence was introduced that was obtained as a result of seizure of the Defendant. Therefore, the first branch of the Defendant's motion to suppress is OVERRULED.

With regard to the second branch of the Defendant's motion to suppress, which this Court interprets as an inartfully written objection to the protective sweep made by the police after the seizure of the Defendant, and upon careful review of the applicable case law, this Court finds that the police acted within the confines set by the Fourth Amendment to the Constitution of the United States and the Ohio Constitution. Therefore, this portion of the Defendant's motion to suppress is also OVERRULED.

{¶ 15} The court further determined as follows:

A protective sweep is a reasonable exception to the Fourth Amendment's warrant requirement. **Maryland v. Buie**, **494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)**. "A protective sweep, however, is not a full search of the premises. It is only a cursory inspection of those areas

where a person who possesses a threat of danger to the police may be found."
* * * Thus the police were privileged to enter the apartment and make their own determination of whether there were people left in the apartment.

Once in the apartment, the police found the gun allegedly used against the complainant in plain view on a bed in the master bedroom. * * * As a matter of law, the court finds that the police did not violate the Defendant's constitutional rights when they entered the complainant's apartment during a protective sweep and found the gun on the bed in plain view.

{¶ 16}   Boyd's sole assignment of error is as follows:

"THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF THE UNCONSTITUTIONAL SEARCH OF HIS RESIDENCE."

{¶ 17}   As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted) .   At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted).   The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted).   In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the

proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." *State v. Hurt*, Montgomery App. No. 21009, 2006-Ohio-990.

*State v. Purser*, 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

{¶ 18} Boyd asserts that the protective sweep performed by the officers is unconstitutional, since "[n]ot a single fact was testified to that would have provided an independent basis to suspect someone might be in the apartment after Boyd was taken into custody." The State responds that upon arrival the officers "learned that there was a group of people inside" the apartment, and that the protective sweep was "warranted as a protective sweep for officer safety," in reliance on *State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960 (2d Dist.). The State further asserts that exigent circumstances justified the warrantless entry into the apartment. Finally, the State asserts that Boyd did not have a reasonable expectation of privacy in Satterwhite's apartment, and that he accordingly lacked standing to contest the search.

{¶ 19} In *Sharpe*, the trial court denied Sharpe's motion to suppress cocaine seized by police officers in the course of executing a warrant at Sharpe's residence. Officers were initially dispatched to the residence on a domestic violence complaint, and upon arrival they were met by Sharpe's girlfriend, the alleged victim. Sharpe was not present, and after speaking with his girlfriend, the officers obtained a warrant for Sharpe's arrest for domestic violence.

{¶ 20} Later on the same date, officers received information that Sharpe was at

another address with a weapon, and that he was threatening to kill himself. Police then received a third call that Sharpe had entered his own residence through a rear window. Officers dispatched to Sharpe's residence were aware that warrants for his arrest had been sought, and that he might be armed. Several units surrounded the residence, where they remained for two to three hours in an effort to get Sharpe to exit the residence. Eventually, Sharpe left the residence through the front door, and he was taken into custody. No weapon was found on his person.

{¶ 21} Officers then performed a protective sweep of the residence, and a sergeant on the scene testified at the suppression hearing that the sweep was done to "'check for the safety and welfare of any other individuals that may have been involved or been inside the house, due to the circumstances that had occurred prior to taking Sharpe into custody leading to the possible possession of a weapon, threat of harm to himself, and the violence of the incident that occurred earlier against his girlfriend.'" *Id.*, ¶ 10. The sergeant further testified, "'We did not know at any time if anybody else was in that residence; and for the security and safety of anybody else, the sweep was conducted of that residence just for any other individuals.'" *Id.*, ¶ 11.

{¶ 22} On appeal, Sharpe asserted that the search of the residence violated the Fourth Amendment to the United States Constitution. This Court noted:

> The Fourth Amendment to the Constitution of the United States commands:
>
> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,

and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fourth Amendment is made applicable to the states through the Fourteenth Amendment. * * * For violations of the Fourth Amendment, courts are commanded to apply the exclusionary rule, suppressing use of any evidence that was illegally obtained. *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081.

Section 14, Article I of the Ohio Constitution is virtually identical in its terms to the Fourth Amendment. Suppression of evidence is authorized by Crim.R. 12(C)(3). Thus, the reach of Section 14, Article I of the Ohio Constitution is co-extensive with that of the Fourteenth Amendment. * * *

The heart of the Fourth Amendment is its reasonableness test, and the mechanism the Fourth Amendment establishes to insure that the reasonableness test is satisfied is the companion requirement of a prior judicial warrant. Thus, "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable." * * *

Warrantless searches are not per se illegal, however, and will be upheld when, under the facts and circumstances of the particular case, it   was reasonable for law enforcement officers to forego securing a warrant prior to conducting a search or seizure. Reasonableness is demonstrated when the

"societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." * * *

In order to justify an exception to the warrant requirement, the costs involved in obtaining a warrant must be sufficiently significant to justify avoiding the delay inherent in procuring a warrant. The normal inconvenience and slight delay involved in procuring a warrant, standing alone, "are not enough to bypass the constitutional requirement." * * * And because the warrant requirement functions to set limits on police discretion, warrantless searches are unconstitutional absent a recognized exception, "notwithstanding facts unquestionably showing probable cause" sufficient to obtain a warrant. * * *. *Sharpe*, ¶ 23 - 29.

{¶ 23} We discussed *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), in *Sharpe*, as follows:

In [*Buie*], two men, one of whom wore a red running suit, committed an armed robbery of a pizza restaurant. That same day, police obtained arrest warrants for two suspects, Jerome Buie and Lloyd Allen. Buie's house was placed under surveillance. Two days later, believing that Buie was inside his home, police entered to arrest him. In an attempt to find Buie, one of the officers first secured access to the basement and then twice shouted out into the basement, ordering anyone down there to come out. A male voice called back in reply. Eventually, a pair of hands was seen at the bottom of the stairwell, and Buie came

up the stairs and was arrested. Thereafter, another officer entered the basement "in case someone else" was down there. When he did, the officer found a red running suit in plain view, connecting Buie to the armed robbery.

Buie moved to suppress evidence of the red running suit police had seized. A Maryland court of appeals held that the trial court erred when it denied Buie's motion. On review, the Supreme Court reversed the state court, holding that the warrantless entry into Buie's basement was not unreasonable. *Sharpe*, ¶ 32-33.

**{¶ 24}** This Court further noted:

The Supreme Court emphasized that per *Payton v. New York* (1980), 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639, the warrant for his arrest authorized police to enter Buie's residence in order to find and arrest him, and to search the premises for him until he was found. However, that authority terminated when Buie was arrested. The court rejected Buie's argument that probable cause was required for police to then enter the basement as they did. Drawing an analogy to *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201, which likewise rejected a probable-cause standard when there is a "need for law enforcement officers to protect themselves [against] violence in situations where they may lack probable cause for an arrest," *Terry*, 392 U.S. at 24, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Supreme Court in *Buie* found a similar "interest of the officers in taking steps to assure themselves that the house in which the suspect is being, or has just been, arrested, is not harboring other persons who are dangerous and who would

unexpectedly launch an attack." * * *

The Supreme Court also pointed out in *Buie* that in contrast to the investigative detentions in *Terry* and *Long*, "[a] protective sweep * * * occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime," * * * being thus comparable to a search incident to an arrest. Further, "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'" *Id*. Nevertheless, returning to the requirements for a search in *Terry* and *Long*, the Supreme

Court wrote:

"We agree with the State, as did the court below, that a warrant was not required. We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors *an individual* posing a danger to those on the arrest scene. This is no more and no less than was required in *Terry* and *Long*, and as in those cases, we think this balance is the proper one." * * * (emphasis added).

By adopting the "reasonable and articulable suspicion" standard of *Terry* and *Long*, the Supreme Court imposed a circumstantial predicate on the authority conferred on law enforcement officers to conduct a protective sweep of a

defendant's residence following his arrest. There must be articulable facts from which police reasonably suspect that the premises in which the defendant is arrested harbors *another person or persons* who may launch an attack on the officers who are there. Absent that basis to act, a protective sweep is an unreasonable search for purposes of the Fourth Amendment, and any incriminating evidence it produces must be suppressed. *Buie*, 494 U.S. at 327, 110 S.Ct. 1093, 108 L.Ed.2d 276. (emphasis added). *Sharpe, ¶* 34 - 37.

{¶ 25} As this Court noted in *Sharpe*, once arrested, a suspect "poses no risk. The fact that a gun or other weapon is on the premises could give other persons an instrument to use in such an attack. But the gun or other weapon poses no danger to officers absent a person or person who might use it to launch an attack." *Id*., ¶ 44.

{¶ 26} As in *Sharpe*, only Boyd, whom both Brazel and Shafer knew by sight, was implicated by Satterwhite. Satterwhite told Brazel that a "third person," her nephew, who was not involved in the altercation, was in the apartment. The nephew emerged from the apartment, followed by Boyd. When Boyd emerged, he was taken into custody. While Brazel testified that, due to the lay out of the building, the officers were vulnerable in the course of the standoff, as in *Sharpe*, there was no "positive indication that another person or persons remain[ed]" in the apartment and posed a threat to the officers after Boyd's arrest. *Sharpe*, ¶ 46. While Brazel stated that he conducted the protective sweep to make sure no other suspects remained in the apartment, "not knowing whether anyone else is there is an insufficient pretext because the need for protection necessarily implies that another person or persons are there. Faced with such doubts, and absent any reason to believe that other persons may be inside, officers must obtain a

warrant before they conduct a search of a defendant's house after a defendant's arrest there."

*Sharpe*,

{¶ 27} Since the officers herein arrested Boyd outside of the apartment, and no one posed a danger to them, the trial court erred when it determined that the protective sweep was justified by the circumstances.

{¶ 28} Regarding the State's assertion that exigent circumstances justified the officers' warrantless entry into the residence, the State specifically directs our attention to the following language in *Sharpe:*

> Under facts and circumstances different from those in this case, when there is positive, specific evidence supporting a reasonable belief that a building contains an unsecured firearm that could pose a danger to the officers or other members of the public who are present inside that building or on the scene, exigent circumstances based upon public safety concerns may justify a warrantless entry to retrieve the weapon. *Id*., ¶ 48.

{¶ 29} This Court in *Sharpe* noted that the "exigent or emergency circumstances exception justifies a warrantless entry in a variety of situations, including when entry into a building is necessary to protect or preserve life, to prevent physical harm to persons or property, or to prevent the concealment or destruction of evidence, or when someone inside poses a danger to the police officer's safety. * * * ." *Id*., ¶ 48. This Court further noted, however, that "the mere fact that a firearm may be located within a private home is not, by itself, sufficient to create an exigent or emergency circumstance. * * *. What must be present is a risk of danger from its use."

{¶ 30} As in *Sharpe*, the firearm herein posed no danger after Boyd's arrest, "except to the extent that another person might use it. * * * The concern that another person might be there was wholly speculative, and presented no emergency requiring police to enter the house without a warrant to find the gun." *Id.*, ¶ 51. Accordingly, we conclude that there were no exigent or emergency circumstances justifying the officers' entry into the apartment.

{¶ 31} Finally, regarding the State's assertion that Boyd lacks standing to object to the search, we note that a "defendant's motion to suppress must only establish that a warrantless search took place and notify the prosecution of the factual and legal grounds on which the defendant's challenge rests. * * * . Once the defendant has met this burden, the prosecution bears the burden of proving that the search was legal. * * *." *State v. Henderson*, 2d Dist. Montgomery No. 16016, 1997 WL 691459, * 2 (Nov. 7, 1997). "One way the state can satisfy its burden is by raising the defendant's lack of standing to contest the search." *Id.* In that event, "the burden shifts back to the defendant to prove that he or she had a legitimate expectation of privacy in the area searched. * * *." *Id.*

{¶ 32} Herein, the State did not contest Boyd's standing to challenge the constitutionality of the search, thus it is waived. Furthermore, the facts suggest standing exists. Brazel testified that dispatch advised him that a "female had called in stating that the person she lived with had put a gun to her." Brazel testified that he "understood that [Boyd] basically lived" at the address to which he responded. He and Shaffer both stated that they had responded to reports of domestic incidents involving Sattterwhite and Boyd at that address in the past.

{¶ 33} For the foregoing reasons, we sustain Boyd's assignment of error. Boyd's conviction and sentence are reversed, and the matter is remanded for proceedings consistent with

this opinion.

. . . . . . . . . .

FAIN, P.J. and WELBAUM, J., concur.

Copies mailed to:

Joseph R. Habbyshaw
Robert L. Mues
Hon. Michael W. Krumholtz