[Cite as *State v. Cannady*, 2019-Ohio-1543.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28115 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-3592/1 |
| | : | |
| CARLOS CANNADY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of April, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MICHELLE M. MACIOROWSKI, Atty. Reg. No. 0067692, 7333 Paragon Road, Suite 170, Dayton, Ohio 45459
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} After the trial court overruled his motion to suppress, Carlos Cannady pled no contest in the Montgomery County Court of Common Pleas to one count of improper handling of a firearm in a motor vehicle, a felony of the fourth degree. The trial court sentenced him to five years of community control. Cannady appeals from his conviction, claiming that the trial court erred in denying his motion to suppress. For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 2} The State's evidence at the suppression hearing established the following facts.

{¶ 3} On November 9, 2017, Dayton Police Officer Jordan Alexander was on patrol in a marked cruiser with Officer Matthew Carpenter, whom Alexander was training. At approximately 10:15 p.m., Alexander observed a black Dodge Magnum turn a corner very quickly and drive past Alexander's cruiser in the opposite direction. Alexander did a U-turn to follow the Magnum. Alexander then saw the vehicle turn into a driveway without signaling. With his overhead lights activated, Alexander drove into the driveway behind the Magnum and initiated a stop based on the failure to signal.

{¶ 4} At that point, Officer Alexander could not tell how many people were in the Magnum. When the Magnum came to a complete stop, three men exited and began going in different directions -- two (the driver and back-seat passenger) toward a house and one (the front-seat passenger) toward an alley. Alexander told the individuals to stop and directed all three to come back to his cruiser. The men complied. Alexander testified that the three men were not free to leave.

**{¶ 5}** The driver of the Magnum was identified as David McElrath; Officer Alexander later learned that they were at McElrath's house. McElrath's two passengers were Cannady and Marcus Blackwell. Alexander did not specifically testify where Cannady and Blackwell had been seated in the vehicle, but the officer stated that he saw Blackwell next to the rear driver's-side door when he (Alexander) got out of his cruiser. Alexander's testimony suggested that Cannady was the front-seat passenger.

**{¶ 6}** Officer Alexander walked to the Magnum and, for officer safety, looked through the windows to see if any other individuals were in the vehicle; no additional people were present. However, he observed, in plain sight, a handgun on the front passenger floorboard. Alexander called for additional crews, and the three detained individuals were patted down for officer safety. When additional crews arrived, the individuals were placed in separate cruisers.

**{¶ 7}** McElrath, the driver, provided Alexander a state ID, but he did not have a valid driver's license. Because McElrath was not a licensed driver, Alexander decided to have his vehicle towed. Alexander testified that he performed an inventory of the vehicle, pursuant to the Dayton Police Department Tow Policy. Two additional handguns were found in the Magnum during the inventory search, one on the driver's floorboard and one on the rear driver's side floorboard. The two weapons, plus the previously-found weapon, were located in the positions from which the three defendants exited the vehicle. McElrath, Cannady, and Blackwell were taken to jail, where Cannady and McElrath made statements.

**{¶ 8}** Cannady was subsequently indicted for improper handling of a firearm in a motor vehicle, a fourth-degree felony. McElrath and Blackwell also faced charges.

**{¶ 9}** On January 30, 2018, Cannady filed a motion to suppress, seeking the suppression of any statements that he made and all evidence obtained from the stop of the vehicle. Cannady asserted that the officers lacked a reasonable suspicion to stop and detain the vehicle, and that the officers lacked probable cause to detain, seize, search, and arrest him. Cannady's co-defendants filed similar motions.

**{¶ 10}** A joint hearing on the motions was held on April 11 and May 11, 2018, at which Officers Alexander and Carpenter testified. The State also presented videos from the three cruisers involved in the stop. At the hearing, Cannady indicated that his motion to suppress statements was limited to any statements that he made at the scene prior to his being transported to the jail.

**{¶ 11}** In denying Cannady's motion to suppress, the trial court found that the search of the Magnum was lawful. It reasoned:

In the case at bar, there is no dispute that Alexander initiated the traffic stop because McElrath failed to signal when he turned into the driveway. Since it was a valid traffic stop, the police were justified in detaining the driver (McElrath) and the passengers (Cannady and Blackwell) while McElrath was being identified and citations were issued. Further, Alexander credibly testified that he viewed a handgun in plain sight when looking through the window of the vehicle, shortly after the stop, thereby further justifying the detention of each of the defendants. Finally, the search of the vehicle was conducted per Dayton Police Department policy because the [sic] McElrath, the driver[,] did not have a valid driver's license. Accordingly, the search of the Magnum was valid.

{¶ 12} The trial court further found that statements made by Cannady and the others at the scene were not made in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court noted that the scene was "chaotic" and that "no questioning of the defendants occurred that was beyond a couple of investigatory questions to allow the officers to assess the situation and proceed safely. At that time, it was not known to Alexander and Carpenter whether anyone else was in the car or why the defendants would attempt to leave after the police cruiser had activated its lights."

## II. Review of Suppression Ruling

{¶ 13} On appeal, Cannady raises three assignments of error, all of which relate to the stop and search of the Magnum. Cannady claims that the trial erred in denying his motion to suppress, because (1) the court erred in finding that there was no dispute regarding the validity of the traffic stop, (2) there was no credible evidence that there was a weapon in plain sight, and (3) the State failed to prove that it searched the vehicle in compliance with the Dayton Police Department's Tow Policy.

{¶ 14} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 15} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a minor traffic violation. *Id.*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop. *State v. Belvin*, 2d Dist. Montgomery No. 25987, 2014-Ohio-3634, ¶ 8.

{¶ 16} First, Cannady claims that the trial court erred in finding that "there was no dispute" that Officer Alexander initiated the traffic stop due to McElrath's failure to signal his turn into the driveway. Cannady emphasizes that Alexander was cross-examined about his ability to view the alleged failure-to-signal violation while making a U-turn and about whether the officer had decided to stop the vehicle prior to the Magnum's turn into the driveway. Cannaday argues: "It strains all bounds of credulity to believe that while executing his own U-turn, Officer Alexander would be able to view the Magnum prior to it[s] turning into the driveway * * *."

{¶ 17} R.C. 4511.39(A) provides that "[n]o person shall turn a vehicle * * * unless or until such person has exercised due care to ascertain that the movement can be made

with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided." The statute further requires "a signal of intention to turn" to be given "continuously during not less than the last one hundred feet traveled by the vehicle * * * before turning." *Id.*

{¶ 18} Officer Alexander testified that he noticed the Magnum turn "really fast" onto the street and drive toward him, which prompted Alexander to do a U-turn. Alexander stated, "As I was doing a U-turn, I saw he was – he did not have a signal on, and as I completed my U-turn, I saw him turn into a driveway." (Supp.Tr. at 10.) Alexander clarified, "After I completed my U-turn, he turned into a driveway. Before doing so, he failed to signal right going into the driveway." (*Id.* at 10-11.) Alexander testified that he was looking to the left as he conducted his U-turn and could see the failure to signal. Alexander further stated that the Magnum was within 100 feet of the driveway when this occurred. The officer testified that he later issued a citation for failure to signal.

{¶ 19} During cross-examination, Officer Alexander was asked about his observations of the Magnum's turn onto the street and both the Magnum's and the officer's subsequent actions. Alexander testified that he made the U-turn after seeing the Magnum turn rapidly onto the street and that the officer "was going to get behind him [the Magnum]" to follow the vehicle. Alexander stated that, at that point, he observed the failure to signal and decided to stop the Magnum.

{¶ 20} Matthew Carpenter[1] was called as a defense witness. During his initial questioning by counsel for McElrath, Carpenter testified that he was a passenger in a cruiser driven by Officer Alexander, his training officer. After they observed a black

---

[1] Carpenter was not employed as a police officer when the suppression hearing occurred.

Magnum "come around the turn," Officer Alexander "turned the patrol car around and initiated a stop." When asked if the basis for the stop was the Magnum's "quick turn," Carpenter responded, "Well, that was the first thing that tipped it off. I think he [Officer Alexander] mentioned that it didn't signal. That's why we initially stopped." Carpenter explained that, after the incident was over, he and Officer Alexander "sat down together and did the report because I [Carpenter] was a trainee and we walked back through everything." It was at that point, "after everything was over with," that Officer Alexander mentioned the failure to signal. Carpenter did not recall if Officer Alexander said anything when he (Alexander) was turning the cruiser around.

{¶ 21} Cannady's defense counsel asked Carpenter whether it helped his training to be involved in as many traffic stops as possible. Carpenter responded: "There's no set amount. If you witness something you go on it. Like we never stopped anything that wouldn't have a reason to stop any other situation or time of day." Carpenter could not recall any violation of law that the driver of Magnum had committed, but Carpenter commented, "[I]f he [Officer Alexander] was flipping the car around, I would assume that he's going after it" and that there was a reason why.

{¶ 22} Counsel for Blackwell mainly asked Carpenter about Carpenter's actions after the cruiser pulled into the driveway.

{¶ 23} The video from Officer Alexander's cruiser showed the Magnum turn onto the street and pass the cruiser; the driver did not activate his turn signal prior to passing the cruiser. The cruiser made a counter-clockwise U-turn immediately after the Magnum passed the cruiser. When the cruiser completed the U-turn, the Magnum had already turned into a driveway. The Magnum drove past a house and curved to the left. The

cruiser followed the Magnum into the driveway, but stopped prior to the curve. Consequently, the cruiser video does not show the Magnum or any activities that occurred near that vehicle after the Magnum parked.

{¶ 24} It was the role of the trial court, as the finder of fact, to judge both the credibility of the witnesses and to determine the weight of the evidence. *See State v. George*, 2d Dist. Montgomery No. 24889, 2012-Ohio-3597, ¶ 9. The trial court found, based on the testimony, that the officer observed the Magnum "turn the corner very quickly and drive past Alexander's cruiser." The court further found, based on Officer Alexander's testimony, that Alexander made a U-turn, followed the vehicle, and observed the vehicle turn into a driveway without signaling. Officer Alexander pulled into the driveway behind the Magnum and initiated the stop. Based on the trial court's findings, which were supported by competent, credible evidence, the record reflects that the officer had a reasonable and articulable suspicion that the driver of the Magnum had committed a violation of R.C. 4511.39 (use of signals for turning), which justified the stop of the vehicle. The trial court did not err in concluding that the stop of the Magnum was lawful.

{¶ 25} Second, Cannady claims that there was no credible evidence that a weapon was found in plain view. He argues that there was a discrepancy between Officer Alexander's testimony and the police report about the location of the weapon.

{¶ 26} Under the plain view doctrine, a warrantless seizure of incriminating evidence is permissible where "(1) the officers are lawfully positioned in a place from which the object can be plainly viewed, (2) the incriminating character of the object is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *State v. Goode*, 2d Dist. Montgomery No. 25175, 2013-Ohio-958, ¶ 26, citing *Minnesota*

*v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) and *Horton v. California*, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

**{¶ 27}** In this case, Officer Alexander walked up to the Magnum, which was parked in McElrath's driveway, to determine whether any additional individuals were in the vehicle. Alexander stated that he looked in the vehicle's window without using any sort of light to see in; he did not open the door to the vehicle. Alexander testified that, while looking through the vehicle's window, he observed a handgun on the front passenger floorboard.

**{¶ 28}** During cross-examination, counsel for McElrath asked Alexander about the police report for the incident, which was prepared by Carpenter and reviewed by Alexander. Alexander acknowledged that the police report indicated that the gun was located on the front passenger seat. However, Alexander stated that the report would not change his testimony.

**{¶ 29}** Despite the discrepancy between Officer Alexander's testimony and the police report regarding the exact location of the gun, the trial court could have reasonably concluded that Alexander looked through the Magnum's window and observed a handgun on the front passenger side of the vehicle. We find no fault with the trial court's conclusion that the gun was found in plain view, justifying the officer's seizure the weapon. *See State v. Thompson*, 2d Dist. Montgomery No. 25658, 2013-Ohio-4825.

**{¶ 30}** Third, Cannady claims that the trial court erred by overruling his motion to suppress, because the State failed to prove that the Magnum was searched consistent with the Dayton Police Department's Tow Policy.

**{¶ 31}** We have described the inventory exception to the warrant requirement of

the Fourth Amendment, stating:

> "[T]he 'inventory exception' to the warrant requirement of the Fourth Amendment permits the police to conduct a warrantless search to produce an inventory of the contents of an impounded vehicle." To satisfy the inventory exception, the vehicle must be lawfully impounded, the inventory search must be conducted pursuant to reasonable standardized procedures and also not be a pretext for an evidentiary search. With respect to the standardized policy requirement, " 'the evidence presented must demonstrate that the police department has a standardized, routine policy, demonstrate what that policy is, and show how the officer's conduct conformed to that policy.' "

(Citations omitted.) *State v. Thompson*, 2d Dist. Montgomery No. 26130, 2014-Ohio-4244, ¶ 38.

{¶ 32} Officer Alexander testified that he decided to tow McElrath's vehicle, pursuant to the tow policy, because McElrath did not have a valid driver's license. Regardless, we need not decide the validity of the inventory search in this case. The evidence at the suppression hearing reflected that Cannady was seated in the front passenger seat of the vehicle. The weapon corresponding to Cannady's location in the vehicle (and which formed the basis of his plea of no contest) was found, in plain view, when Officer Alexander looked through the vehicle's window, not during the inventory search.

{¶ 33} The State asserts that Cannady also lacks standing to object to the inventory search. In general, a passenger has no standing to challenge the search of a

vehicle if the passenger has no proprietary or possessory interest in the vehicle. *See, e.g., State v. Jalloh*, 2d Dist. Montgomery No. 24972, 2012-Ohio-5314, ¶ 31, citing *State v. Parker*, 2d Dist. Montgomery No. 24406, 2012-Ohio-839, ¶ 27, citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *State v. Johnson*, 2d Dist. Clark No. 2011CA79, 2012-Ohio-4082, ¶ 10 ("[A] passenger must possess a legitimate expectation of privacy in the vehicle or its contents in order to challenge a search following a legal stop."); *State v. Miller*, 2017-Ohio-961, ¶ 7, 86 N.E.3d 695, ¶ 7 (8th Dist.).

**{¶ 34}** "Although the defendant has the burden of proving standing, the defendant's burden does not arise until the State places the issue in controversy." *State v. Henderson*, 2d Dist. Montgomery No. 16016, 1997 WL 691459, * 2 (Nov. 7, 1997); *see also State v. Boyd*, 2d Dist. Montgomery No. 25182, 2013-Ohio-1067, ¶ 31. Here, the State did not raise in the trial court Cannady's standing to challenge the constitutionality of the search of the Magnum. Accordingly, the State's standing argument is waived.

**{¶ 35}** Cannady's assignments of error are overruled.

### III. Conclusion

**{¶ 36}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck
Michael P. Allen
Michelle M. Maciorowski
Hon. Barbara P. Gorman