[Cite as *State v. Williams*, 2019-Ohio-5142.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                                :
                                             :
        Plaintiff-Appellee                   :   Appellate Case No. 28299
                                             :
v.                                           :   Trial Court Case No. 2018-CR-3051
                                             :
NEWELL WILLIAMS                              :   (Criminal Appeal from
                                             :    Common Pleas Court)
        Defendant-Appellant                  :
                                             :

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of December, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301
West Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

J. DAVID TURNER, Atty. Reg. No. 0017456, P.O. Box 291771, 101 Southmoor Circle
NW, Kettering, Ohio 45429
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Newell Williams was convicted after a jury trial in the Montgomery County Court of Common Pleas of aggravated possession of drugs, possession of heroin, possession of cocaine, aggravated possession of drugs, and tampering with evidence. The trial court imposed an aggregate sentence of 48 months in prison.

{¶ 2} Williams appeals from his conviction, claiming that his counsel rendered ineffective assistance by failing to "file and pursue a motion to suppress evidence." For the following reasons, the trial court's judgment will be affirmed.

### I. Factual and Procedural History

{¶ 3} The evidence at trial established the following facts.

{¶ 4} On August 1, 2018, Detectives Justin Ellis and Matt Gray of the Violent Offender Unit were on patrol in an unmarked police vehicle in a particular area of Dayton due to a high volume of weapon complaints in that area. Both officers had been detectives for a year or less, but both had previously been patrol officers. Detective Ellis testified that he previously had been a patrol officer in that specific area of Dayton.

{¶ 5} While on patrol, the detectives observed a red Prism driving "kind of slow in the area," which they found suspicious. They continued to observe the vehicle and saw it meet up with a light green sedan, with the two cars facing in opposite directions. The detectives then observed what they believed to be a hand-to-hand drug transaction. Detective Gray explained that "the drivers of both vehicles quickly exchanged something through their windows as they were next to each other. The transaction didn't last very long and both vehicles drove away." (Tr. at 131.)

{¶ 6} Believing the green vehicle's occupant was the seller, the detectives attempted to follow that vehicle and get its license plate, but the detectives lost sight of it.

However, they chanced upon the red Prism that they had previously observed. Detective Ellis testified that, due to the hand-to-hand transaction, the detectives requested a uniformed officer to stop the Prism. (Tr. at 122.) Detective Gray testified that they "observed several traffic violations," and they requested a uniformed crew to make a "traffic stop on the vehicle." (Tr. at 132.)

{¶ 7} Officer Christopher Smith, a 28-year veteran with the Dayton police, was on patrol in a marked cruiser when he was instructed by Detectives Ellis and Gray to pull over a red Chevy Prism. The detectives reported that they had witnessed a hand-to-hand transaction between the occupants of the Prism and another vehicle. Smith followed the detectives' instructions on their location and heading, and he was able to locate and initiate a stop of the Prism. Smith testified that he activated his overhead lights, which also activated his onboard camera. Detectives Ellis and Gray were at the scene when the Prism was pulled over, and they joined Smith for the stop.

{¶ 8} Upon pulling over the Prism, Officer Smith and the detectives approached the vehicle and learned that Cassandra Brumbaugh was the driver of the vehicle and Williams was the front-seat passenger. Two small children were in the backseat area. When Smith asked Brumbaugh for her driver's license, she indicated that she did not have any driver's license or photo identification. The officers asked Brumbaugh to step out of the vehicle. Because the driver's door handle was broken, the officers asked Williams to step out of the vehicle to allow Brumbaugh to exit from the passenger side. Detective Gray took Williams to Smith's cruiser, patted him down for weapons, and placed him in the backseat. No drugs were discovered during this pat down.

{¶ 9} Detective Ellis testified that, from the passenger side of the vehicle, he saw

"in plain view, a clear plastic bag with what I suspected to be methamphetamine." Ellis stated that it was "kind of poorly shoved between the passenger seat and the center console, in between that area." (Tr. at 125.) Ellis indicated that Williams had been seated in the front passenger seat. Ellis removed the bag from the car, so that it would not be accessible to the children who remained in the vehicle.

{¶ 10} Officer Smith asked Williams for his identifying information, but Williams provided information related to his brother. (When attempting to verify the information, Smith pulled up a photo of Williams's brother, who had a tattoo on his neck, which Williams did not have.) Smith eventually learned Williams's actual identity.

{¶ 11} From Smith's cruiser, Williams watched the interaction between Brumbaugh and the detectives. At Williams's request, Smith opened the window so Williams could have some fresh air. At one point, Williams called out, "If there is anything in that car, it's mine." Based on the detectives' finding suspected drugs and Williams's statement, the detectives decided to arrest Williams. Detective Gray informed Williams of his *Miranda* rights. Williams told the detectives that the drugs were his. Once Gray asked Williams more about from whom he had gotten the drugs, Williams said he wanted to end the interview.

{¶ 12} Williams was then handcuffed behind his back, and Smith transported him to jail. During transport, Williams began to "mov[e] around very violently. He was moving up and down and manipulating his hands." (Tr. at 114.) Officer Smith put on his rear camera lights so that he could watch Williams through his camera mounted on the front windshield. Smith observed Williams "bowing forward and tugging and pulling at the back of his blue jeans pants. * * * And his handcuffs kept flicking and banging

against the back of [the] plastic molding [in the backseat]." (*Id.*) Smith asked Williams why he was moving, to which Williams responded that the handcuffs were too tight and his fingers were going numb. Officer Smith testified that, from his experience, Williams was "trying to pull something out of his back, rear." (*Id.* at 115.)

{¶ 13} Once Williams got to jail, a corrections officer performed a clothed pat down search of Williams in the receiving area; the corrections officer felt something in Williams's buttocks area. The corrections officer asked for an additional unit and a sergeant to respond. Deputy Sheriff Andrew Whittman went to the receiving area and performed another pat down of Williams. Two baggies of drugs were recovered from Williams's buttocks or groin area. After the baggies were photographed, Officer Smith received those additional drugs to package as evidence. Smith took the drugs directly to the police property room with a laboratory analysis sheet so the crime lab could test them. (State's Exhibit 6.) Detectives Gray and Ellis separately submitted the drugs found in the Prism to the property room. (State's Exhibit 5).

{¶ 14} The Miami Valley Regional Crime Lab received two submissions. Testing on the drugs revealed that Submission 1 contained 1.1 grams (gross weight) of methamphetamine. Submission 2 consisted of the one baggie containing 5.98 grams (net weight) of methamphetamine and a second baggie containing 2.34 grams (net weight) of a powder that contained heroin, fentanyl, and cocaine.

{¶ 15} Williams testified on his own behalf at trial. He indicated that he, his two daughters, and the mother of his children were in a car that was pulled over by the police. Soon after the stop began, he was placed in the back of a cruiser. Williams acknowledged that he told the officers that whatever was found in the vehicle was his.

He indicated that he made that statement because he saw the mother of his children crying. Williams testified that he did not know that anything was in the car at the time. Williams indicated that he fidgeted in the cruiser while being taken to jail because it was hot, the handcuffs were tight, and his fingers were going numb. Williams denied that he had drugs on his person when he was patted down at the jail.

{¶ 16} On September 21, 2018, Williams was indicted for aggravated possession of drugs (methamphetamine) (bulk but <5 times bulk), a third-degree felony (Count 1), possession of heroin (1 gram but less than 5 grams), a fourth-degree felony (Count 2), possession of cocaine (less than 5 grams), a fifth-degree felony (Count 3), aggravated possession of drugs (fentanyl), a fifth-degree felony (Count 4), and tampering with evidence (alter/destroy), a third-degree felony (Count 5).

{¶ 17} The record does not contain a motion to suppress, but on October 30, 2018, the trial court scheduled a hearing on a motion to suppress for November 15, 2018. Defense counsel subsequently sought a continuance of the November 15 hearing. The court granted the motion and continued the hearing until December 11, 2018. On November 21, 2018, the trial court approved a written request by defense counsel to withdraw the motion to suppress.

{¶ 18} The matter proceeded to a jury trial in January 2019; the jury convicted Williams of all charges. Williams appeals, claiming that his trial counsel rendered ineffective assistance by failing to move to suppress the evidence against him.

## II. Ineffective Assistance – Failure to File Motion to Suppress

{¶ 19} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of

reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). Trial counsel is also entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 689.

{¶ 20} The "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Rather, "trial counsel's failure to file a motion to suppress constitutes ineffective assistance of counsel only if the failure to file the motion caused the defendant prejudice; that is, when there is a reasonable probability that, had the motion to suppress been filed, it would have been granted." *State v. Blackshear*, 2d Dist. Montgomery No. 24302, 2011-Ohio-2059, ¶ 26; *see also State v. Vineyard*, 2d Dist. Montgomery No. 25854, 2014-Ohio-3846, ¶ 31.

{¶ 21} On appeal, Williams claims that his counsel should have filed a motion to suppress, because Officer Smith did not lawfully stop the vehicle in which Williams was a passenger. Williams argues:

Officer Smith did not initiate a traffic stop of Defendant's vehicle for

any offenses committed in his presence. Officer Smith initiated a traffic stop based upon a request from Detectives Ellis and Gray. The trial transcript reflects that Detectives Ellis and Gray directed Officer Smith to initiate a traffic stop of a red Chevy Prism based upon their observation of what they believed was a hand-to-hand transaction between vehicles. There is no evidence that any other identification as to this vehicle, such as year, make, or license plate number, was provided to Officer Smith for purposes of initiating a traffic stop. The trial transcript reflects that Detectives Ellis and Gray had been detectives for less than a year. No evidence was set forth as to their experience and training in the matter of alleged drug transactions and being detectives for a year or less is indicative of their lack of experience and training in these matters.

The failure to file and pursue a motion to suppress cannot be considered sound trial strategy under these circumstances. * * *

{¶ 22} Williams does not raise any issues related to the officers' conduct after initiating the stop of the Prism, such as the placement of Williams in the police cruiser and the seizure of the drugs, either from the car or at the jail. Williams also does not claim that, had a motion to suppress been filed, there is a reasonable probability that the trial court would have suppressed any statements that he made. We confine ourselves to the specific issue that Williams raises, i.e., the lawfulness of the stop.

{¶ 23} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or

temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *Id.*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991); *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 10.

{¶ 24} "[P]olice officers are entitled to rely on information received from other officers." *State v. Wortham*, 145 Ohio App.3d 126, 130, 761 N.E.2d 1151. As we stated in *Wortham*:

> If an officer detains an individual suspected of criminal behavior in reliance on information received from a fellow officer, who has a reasonable suspicion to make a stop, he need not have independent grounds for suspecting criminal activity but may rely on the information given via the dispatch. However, the [S]tate must show that the officer who provided the information had a valid reasonable suspicion of criminal activity."

*Id.* at 130, citing *Maumee v. Weisner*, 87 Ohio St.3d 295, 298, 720 N.E.2d 507 (1999).

{¶ 25} In this case, the detectives' testimony at trial indicated that they were on patrol in an area known for a high volume of weapons complaints. Although Ellis and Gray had been detectives for no more than a year, both had previously been patrol officers, and Ellis testified that he had been a patrol officer in the area at issue. While on

patrol, the detectives observed the red Prism in which Williams was a passenger and another vehicle engage in what they believed was a hand-to-hand drug transaction. Detective Gray explained that the vehicles stopped facing in opposite directions, the drivers of the vehicles exchanged something quickly, and then the vehicles drove away. The evidence at trial supported a conclusion that, based on their experience, the detectives had a reasonable articulable suspicion that the occupants of both vehicles had engaged in criminal (drug) activity, warranting a stop of their vehicles. *See, e.g., State v. Smith*, 2d Dist. Montgomery No. 28207, 2019-Ohio-4373 (officer had reasonable articulable suspicion that he was observing a drug transaction when he requested assistance from another officer, who stopped the defendant's vehicle).

{¶ 26} Detective Gray further testified, albeit summarily, that he observed several traffic violations before requesting assistance from Officer Smith. It is well established that the observation of a minor traffic violation can provide reasonable articulable suspicion that criminal activity is afoot, justifying a traffic stop. *E.g., State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8; *State v. Cannady*, 2d Dist. Montgomery No. 28115, 2019-Ohio-1543, ¶ 15.

{¶ 27} Officer Smith did not have to personally observe the drug transaction or any traffic violation in order to stop the red Prism. He was entitled to rely on the observations of Detectives Ellis and Gray, which justified the stop. Although there was no testimony at trial that the detectives relayed the Prism's license plate number or model year, Officer Smith testified that he followed the detectives' instructions "on the location they were headed" and, based on that information, was able to initiate a stop. Detective Ellis indicated that the detectives were "at the scene" when Officer Smith pulled the Prism

over, and the detectives proceeded to assist with the stop. Had a motion to suppress been filed, the trial court could have reasonably concluded that the Officer Smith was provided sufficient information to initiate a stop of the red Prism that the detectives had observed.

{¶ 28} Based on the record before us, Williams has not established that there was a reasonable probability that, had the motion to suppress been filed, the trial court would have concluded that the stop of the red Prism was unlawful. Because Williams has not demonstrated that a reasonable probability exists that a motion to suppress would have been successful, we cannot conclude that Williams was prejudiced by the trial counsel's failure to file and pursue a suppression motion.

{¶ 29} Williams's assignment of error is overruled.

### III. Conclusion

{¶ 30} The trial court's judgment will be affirmed.

. . . . . . . . . . . .

WELBAUM, P.J. and DONOVAN, J., concur.


Copies sent to:

Mathias H. Heck
Lisa M. Light
J. David Turner
Hon. Mary Katherine Huffman